## CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF SOUTH CAROLINA.

---

Justices of the Supreme Court during the Period comprised in this Volume.

Hon. WILLIAM D. SIMPSON, Chief Justice.
Hon. HENRY McIVER, Associate Justice.
Hon. SAMUEL McGOWAN, " "

---

## BANKER v. HENDRICKS.

1. A woman, 82 years of age, and very ill, not expected to survive a day, executed to a stranger a deed of conveyance of her entire real estate, worth $2,500, for the alleged consideration of $2,000, but no money was paid or agreed to be paid, the grantee averring that the real consideration was that he should support the grantor and her husband (who was then over 70 years of age) for the remainder of their lives. Two weeks afterwards, upon the expressed consideration of such support, this old woman and her husband executed a bill of sale of all their personal property to this same grantee, who then executed a bond for $2,000, and a mortgage of the lands conveyed to him, to secure such support, and handed the mortgage to his attorney to be recorded, which was not done. In action by this old woman to set aside and cancel this deed and bill of sale, held, that the plaintiff was imposed upon by defendant, while she was in an extremely feeble con-

dition, mentally and physically ; that the consideration was, under the circumstances, grossly inadequate ; and that both instruments must be cancelled. MR. CHIEF JUSTICE SIMPSON, *dissenting.*

2. All the issues of law and fact having been referred to a referee, and no testimony introduced to sustain the allegation in the complaint of damages done to the property by defendant while in his possession, that question cannot be again raised in the cause.

Before ALDRICH, J., Pickens, September, 1884.

Action by Charlotte S. Banker against William A. Hendricks, commenced March 5, 1884. The opinion fully states the case.

*Messrs. Child & Boggs,* for appellant.

*Messrs. M. F. Ansel* and *J. H. Newton,* contra.

November 2, 1885. The opinion of the court was delivered by

MR. JUSTICE MCIVER. The object of this action is to set aside a deed and bill of sale, whereby the plaintiff conveyed and transferred to the defendant every vestige of her property, both real and personal, even including all her household furniture, beds and bedding, upon the ground of fraud and imposition practised upon her at a time when she was so enfeebled by age and disease as to be incapable of transacting such business.

It seems that the plaintiff is a very old lady, in the eighty-third year of her age, living with her husband, a feeble old man, who has passed the age of three score and ten, with no children, and no relatives, except a brother and some nieces. The defendant was her tenant, in no way related to or connected with her, represented to be a young man of some thirty-five or forty years of age. On November 21, 1883, the deed for the real estate was executed while the plaintiff was very low indeed, so much so as to create the belief in the minds of her neighbors and herself that she could not live more than twenty-four hours, and her husband was also sick at the same time. The consideration mentioned in the deed is two thousand dollars, though it is not pretended that any money was paid, or intended to be paid ; the claim on the part of the defendant being that the real consideration was that he was to support these old people during their

lives, though it does not appear that anything was said about it at the time the deed was executed. The person who drew the deed, and who was present when it was executed, though not a subscribing witness, testified that he told the parties that "there had to be a money consideration mentioned in the deed," but he also said: "Nothing was mentioned about the consideration of the deed but the two thousand dollars on the day the deed was executed."

The old lady was so very feeble on the day when the deed was executed that she had to be assisted from her bed to the chair in which she sat when she signed the deed, and had to be assisted in signing her name by the witness, Richey, who was carried to the plaintiff's house by the defendant for the purpose of drawing the deed. The two subscribing witnesses to the deed both testify that the deed was not read to the plaintiff in their hearing, though Richey, who drew the deed, said he read it over to her "two or three times and took particular pains," and added: "Deed was read in presence of witnesses. Called one of them in the room, I don't know whether Frank Smith (one of the subscribing witnesses) was there all the time the deed was being read ; but I rather think both of them were there." The old lady did little or no talking the day the deed was signed, and was moaning or groaning most of the time as if in great distress. Richey, however, testified that "Mrs. Banker was sitting up in a chair when I went in. * * * I told her I had come to fix up the papers ; she told Mr. Banker to get the papers ; she told him where the papers were." Again he says: "Old man did a good deal of the talking, seemed to be active in the matter ; he or she one said the other writing they would fix themselves, in answer to my question if there were any other paper to fix up."

Mrs. Mary Oats testified that Richey told her he had been down drawing up the papers between Mrs. Banker and Mr. Hendricks: "I told him she was not fit to make papers; I told him she was not the evening before. He said he reckoned she was, but that she was very low and the least thing would take her out; it would not do to excite her." Richey does not deny this positively. He says: "Had conversation with Mrs. Oats; don't remember whether she said Mrs. Banker was not fit to fix papers;

don't think I had the conversation mentioned by Mrs. Oats. Don't think I told her a little excitement would take her out." Folger, another witness for the plaintiff, testified to a conversation with Richey at Easley as follows: "Mr. Richey said he had his doubts as to the propriety or legality of the deed, from the fact that he had to hold the old lady's hand." This likewise Richey does not deny positively. His language is: "Don't think I said anything to Newton Folger about the legality of the deed or holding her hand, at Easley; don't remember if I did."

Mrs. Mary Smith testified that "I heard a conversation between plaintiff and defendant about three weeks before deed was made. He offered to buy four acres of land. She told him she would not sell it at any price. He offered to give her fifty dollars an acre; he told her he would take care of her for her property. She told him, No; as long as she kept her right senses he should not have anything she had. Mr. Hendricks called at my house and said for us to be good to the old people and he would pay for it. He said he did not have time to stay over there, as he would have to gather up her corn and things; said if he did not do it before she came to her right mind, he would not get it, for he had tried it enough to know." This witness on her cross-examination stated that her husband was not upon good terms with Hendricks, and that about a month after the deed was made she told Mrs. Oats that she knew something in favor of Hendricks, but would not tell it, but Mrs. Oats testified that this was said by Mrs. Smith in a joke when they were "running on in fun about the trial," though a witness for defendant said he was present when this remark was made by Mrs. Mary Smith, and "he did not consider that she was talking in a joke; they were laughing and talking, but I meant what I was saying."

Mrs. Mollie Hinton, a cousin of the defendant, and living with him, testifies to a good deal that Mrs. Banker said on the day the deed was executed, which none of the other witnesses present at the time seem to have remembered. She says: "Mr. and Mrs. Banker sent Mauldin Smith after Mr. Hendricks. The morning before Mr. Hendricks got there, and before the deed was made, Mrs. Banker told me she was going to make her property

over to Wm. Hendricks to take care of her. She told Mr. Richey this too, and said she did not intend the Claytons nor her brother to have it, for her brother had gone through her mother's property and had no home, and she did not intend for him to have hers. Some of the Claytons were her nieces; she said they had mistreated one of her sons. This occurred the morning before the deed was made. She told me after the deed was made that she had heard that Mr. Banker owed money in Walhalla, and they were coming on her property after she died to pay it, and she did not intend it. This was about a week after the deed was made. She said the Claytons and Mr. Atkinson, her brother, would be mad, but it was her property and she would do as she pleased with it. She said she would not give her property to any one who asked her for it, and Mr. Hendricks never had, and he was the only one could get it." Another witness for the defendant, Mrs. Nancy Gunter, who had been hired by Hendricks to wash for the plaintiff, testified that she had a conversation with the old lady a few days after the deed was made, in which "she said she had made her property over to Mr. Hendricks; that she wanted Mr. Hendricks to have it, as he had been a playmate of her son Cicero, and he would take good care of her; said she had been intending to do it some time, but had let it go on; that she thought it best to do so while she was in her right mind."

The plaintiff and the defendant were both examined, and, as was to be expected, their testimony is very conflicting. If the plaintiff's testimony is to be believed, then it is very manifest that this old lady was grossly imposed upon; but, on the other hand, if the testimony of the defendant is to be given full credence, then though the transaction would still appear to be a very singular and unusual one, yet there would be no ground to impute fraud or imposition to him. The old lady denies *in toto* the conversation detailed by Mrs. Mollie Hinton, and the defendant in like manner denies the conversation detailed by Mrs. Mary Smith. There is, however, one point of concurrence between them, and that is, that but a short time before the deed was made Hendricks offered to buy four acres of the same land conveyed by the deed at a very high price, and that the plaintiff

refused his offer. It seems, too, that very soon after the deed was made the defendant carried off all of the old lady's personal property except her household furniture, and, so far as the testimony discloses, contributed nothing towards her support except one hog and part of another, and employed a woman to do her washing.

The deed for the real estate was promptly put upon record the day after it was executed, and about two weeks afterwards, to wit, on December 7, 1883, Mr. and Mrs. Banker executed a bill of sale to the defendant of all their personal property, of every kind and description whatsoever, in consideration of the comfortable support and maintenance of these two old people, but what was the value of the personal property thus transferred does not appear. On the same day the defendant executed to Mr. and Mrs. Banker a combined bond and mortgage of the real estate conveyed to him by the above mentioned deed, conditioned for the comfortable support of the said Bankers, but this paper was never put into the possession of either Mr. or Mrs. Banker, and was never recorded.

What occurred on the day these last mentioned papers were signed will best be learned from the testimony of Mr. Child, the attorney for the defendant in this case. He says : "I went to Mr. Banker's on the 7th of December last. Mr. and Mrs. Banker had been sued by Mauldin Smith; I was employed to defend them. I went in and they were sitting in the house. They told me about the deed she had made to Mr. Hendricks, and that he was to take care of them. They asked me how to fix the papers so that if Mr. Hendricks should die, they would be taken care of. I told them to take a bond and mortgage from him to secure their support. I prepared the papers; Mr. Hendricks signed, and I brought them and turned them over to Mr. Lewis to be recorded. I suggested that they both sign the deed to the personal property, which they did. From what I heard and saw there I am satisfied she was as competent then to transact her own business as she is now. Mr. Banker did most of the talking. Now, I don't pretend to distinguish what Mrs. Banker said in particular during the conversation. I don't know whether the note was given to me at the house or at Easley. The mortgage

was not recorded; I took it and the bill of sale out of the clerk's office, after there was a talk of this suit." According to the testimony of the plaintiff, she remembers nothing of what occurred when Mr. Child was at her house, and the probability is that she had very little to say in the matter as it appears from Mr. Child's testimony that "Mr. Banker did most of the talking."

Soon after the old lady recovered from the attack of sickness under which she was laboring at the time the deed was executed, she says that she applied to the defendant to restore to her her property, saying that she was ruined and would be turned out of doors. Upon his refusal so to do, this action was commenced, and the case was referred to a referee "to hear and determine the issues of fact and law involved in said case." The referee found as matter of fact that the real value of the land was twenty dollars per acre; that the plaintiff, at the time of the execution of the deed, "was extremely ill and physically weak, but not so weak in mind as to render her *non compos* or disqualified to transact business;" that she was about 83 years of age, and the relation of landlord and tenant existed between the grantor and grantee, "but the testimony fails to satisfy the referee that circumvention, fraud, or undue influence was practised upon the plaintiff by the defendant;" that she was "not laboring under mental disqualification at the time" the bill of sale was executed; that on the 7th day of December, 1883, the defendant executed a bond and mortgage to the plaintiff conditioned for the support of herself and husband, and the payment of two thousand dollars, but the same has not been recorded and turned over to the plaintiff; that said deed was read over to plaintiff before she signed it, and that the plaintiff offered no testimony as to damages." And as matter of law, he found that the deed and the bill of sale were valid; and "that the defendant should be required to execute notes and mortgages to the plaintiff for the value of the land and personal property, or at least a sufficient amount, not less than two thousand dollars, the consideration expressed in the deed, for the comfortable and easy support of the plaintiff and her husband during their natural lives. The old lady should be protected by a court of equity, and it is

against good conscience that her property should pass out of her hands and this court not render the proper relief."

To this report both parties excepted, and the case went before the Circuit Judge to be heard on the report and exceptions, together with the testimony, which is fully set out in the "Case." While he concurred with the referee "that the plaintiff was not *non compos mentis*," which he explains as meaning "bereft of all sense," at the time of the transaction in question, yet he says: "I am perfectly satisfied that she was in such a condition of physical and mental weakness as to be entirely unfit for the transaction of business of any kind, especially of so serious a nature as the transfer of her whole estate;" and the concluding language of the referee's last finding of law would seem to indicate that he too was impressed with some such notion. The Circuit Judge also found that the plaintiff was imposed upon while in this extremely weak and feeble condition, and improperly induced to transfer her whole property to a stranger in blood, not allied to her by any ties of affection, while she had relatives living, some of whom at least would most naturally be the objects of her bounty. He therefore rendered judgment that the deed and bill of sale be cancelled, and that the referee "inquire and report what damage the plaintiff has sustained by the felling of her timber, the removal of her personal effects, and the killing of her stock."

It is impossible to read the testimony in this case without concurring with the Circuit Judge in the view which he has taken of this case. The testimony is too long to be incorporated in this opinion, and therefore only extracts have been given. There was no little conflict amongst the witnesses as to the old lady's mental condition at the time the deed was executed, and there certainly was amply sufficient testimony to support the conclusion reached by the Circuit Judge as to that matter. It is true that the referee seemed to have been of a different opinion, but, as we have said, he evidently was of the opinion that the plaintiff had not been dealt with fairly, and that there was something in the case which, in equity and good conscience, called for the interposition of a court of equity. He doubtless assumed, what we shall presently see is a mistake, that it was necessary to show

that the plaintiff was *non compos mentis,* absolutely "bereft of all sense," in order to warrant the court in setting aside the deed. Hence his conclusion that the plaintiff was not in such a mental condition as would disqualify her from transacting business does not carry with it the weight which it might otherwise carry.

But be that as it may, we think the weight of the testimony is in favor of the conclusion reached by the Circuit Judge. The idea that this old lady should, of her own free will and accord, strip herself of every vestige of property, even down to the bed upon which she rested her aged and feeble body, in favor of a mere stranger, who, so far as we can see from the testimony, had no claim upon her whatever, is so utterly inconsistent with the motives which ordinarily prompt human actions as to be utterly incredible, and could only be sustained by the clearest and most satisfactory evidence of the good faith of the transaction. This old couple had the most abundant means to insure their comfortable support during the very short period which they could, under the most favorable circumstances, expect to live. The plaintiff could not have been in any immediate need of ready money, for, a very short time before the deed in question was signed, she had an offer from the defendant to buy only a very small portion of her land, at a very high price, which she peremptorily refused, although the amount would probably have been sufficient to have provided for her wants during the brief remainder of her life; and the idea that she should, within a few days afterwards, have been willing to convey her entire property, which, according to the testimony, was worth something over twenty-five hundred dollars, to an entire stranger, solely for the consideration that he would provide for the support of herself and husband during their lives, then drawing so rapidly to a close, is utterly incredible.

When to this is added that at the time when the pretended deed was signed the old lady was apparently *in extremis,* not expected to live longer than twenty-four hours; that she was at the time so extremely weak and enfeebled by old age and disease as to be incapable of doing anything, even signing her name, without assistance, and suffering so much as to be unable

to express herself except by groans—as one of the subscribing witnesses said, "she seemed to be very bad off from the way she was groaning; she did not talk any;" or, to use the language of the other subscribing witness, "was groaning, but did not say a word"—and when, in addition to this, we find from the testimony of another witness that she heard a conversation between the plaintiff and defendant, but a very short time before she became so ill, in which the old lady not only refused the defendant's offer of a very high price for a small part of land, but also refused his offer to take care of her for her property, it is impossible to resist the conclusion that the transaction in question cannot receive the sanction of a court of equity. .

Then, too, the conduct of the defendant does not present itself in a very favorable light. In his answer, he says that the plaintiff "earnestly and persistently besought the defendant to allow her (plaintiff) to execute to him a deed of conveyance of all her property in consideration of her support and the support of her husband (Girard Banker) during their natural lives;" but when examined as a witness, subject of course to the ordeal of a cross-examination, he does not venture to put it so strong. He simply says that on the day before the day the deed was signed he got a message from these old people to go and see them, and they told him to go after Mr. Folger, or any other suitable person, to fix up the papers; that he did get Mr. Richey, who was told by them what they wanted done. "He done up the deed as they told him to. I was to support them. This was the consideration of the deed." But Richey, when examined, does not say anything of his being told that the consideration of the deed was that Hendricks was to support these people. On the contrary, he says: "Nothing was mentioned about the consideration of the deed, but the two thousand dollars."

Again, if this was an honest, straightforward transaction, why was it that some security or obligation was not given to the plaintiff by the defendant to secure the performance of his part of the contract? Not a word seems to have been said about that; but Hendricks is very careful and prompt to have the deed recorded the very next day, and it is not until more than two weeks afterwards that we hear of any talk about the defendant

entering into any obligation for the support of these people. What occurred in the meantime to prompt the conscience, or perhaps the fears, of Hendricks, we are not informed. All that we know is that sixteen days afterwards, when Mr. Child is at the house of the plaintiff on other business, he is called upon to draw, and does draw, the combination bond and mortgage set out in the "Case," whereby Hendricks binds himself, under a penalty of two thousand dollars, to provide for the support and maintenance of Mr. and Mrs. Banker, which, however, was never turned over to them, but was carried off by Mr. Child and deposited in the clerk's office to be recorded; but which was never recorded, and was taken out of the office as soon as there was a talk about bringing this suit.

On the same day a bill of sale was executed transferring every vestige of the plaintiff's personal property to the defendant, the consideration expressed therein being the support and maintenance of Mr. and Mrs. Banker. Why the old lady should have been required to transfer her personal property to the defendant, when, according to his own testimony, he already held her deed, duly recorded, for all of her real estate, proved to be worth upwards of twenty-five hundred dollars, which he himself said was executed in consideration of his supporting this aged couple, the testimony does not inform us. Surely, the value of the land was amply sufficient to compensate the defendant for any probable, or we might say, any possible, outlay which he would be called upon to make for the support of these two old people just tottering on the brink of the grave. No witness, not even the defendant himself, has testified that it was any part of the original arrangement on the day the deed for the land was signed that the personal property should also be transferred to the defendant as a part of the price paid for the support of the plaintiff and her husband. On the contrary, as we have said, the defendant distinctly testified that in consideration of the deed for the land he was to support them. Now, if that was a valid transaction, the plaintiff had already, by the execution of the deed for the land, secured a support for herself and husband, and there remained no reason why she should, to secure the same end, transfer all of her personal property. The natural inference is

that the plaintiff was so much under the control and influence of the defendant that she was ready to sign, and did sign, any paper that he might place before her. She certainly could not have been prompted to do so by a desire to secure a support for herself and husband, for, according to the claim of the defendant, that had already been secured by the deed.

But without going any further in the discussion of the testimony, we think that there is quite sufficient to support the conclusion reached by the Circuit Judge, that the plaintiff, while not absolutely *non compos mentis*, was in such an extremely weak and feeble condition, both physically and mentally, as to render her an easy subject to be imposed upon, and that while in this condition she was imposed upon by the defendant.

This being our conclusion as to the facts, the law is clear that she is entitled to the relief asked for. In 1 *Story Eq. Jur.*, § 221, passing from a general notice of cases of fraud, arising from a misrepresentation or concealment of material facts, it is said: "We may now pass to the consideration of some others, which, in a moral as well as in a legal view, seem to fall under the same predicament, that of being deemed cases of actual, intentional fraud, as contradistinguished from constructive or legal fraud, * * * and in especial manner, all unconscientious advantages or bargains obtained over persons disabled by weakness, infirmity, age, lunacy, idiocy, drunkenness, coverture, or other incapacity, from taking due care of or protecting their own rights or interests." Again, in section 235, after referring to the remark of a learned judge, that if a weak man give a bond, and there be no fraud or breach of trust in obtaining it, equity will not set aside the bond only for the weakness of the obligor, if he be *compos mentis*, the learned author proceeds to say: "But whatever weight there may be in this remark, in a general sense, it is obvious that weakness of understanding must constitute a most material ingredient in examining whether a bond or other contract has been obtained by fraud, or imposition, or undue influence ; for although a contract, made by a man of sound mind and fair understanding, may not be set aside, merely from its being a rash, improvident, or hard bargain; yet if the same contract be made with a person of weak understanding, there does arise a

natural inference that it was obtained by fraud, or circumvention, or undue influence." In section 238, it is said : "The doctrine, therefore, may be laid down as generally true that the acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning, artifice, or undue influence."

In *Butler* v. *Haskell*, 4 *DeSaus.*, at page 697, Chancellor DeSaussure, in delivering the opinion of the court, after an elaborate review of the authorities, says: "I consider the result of the great body of the cases to be, that wherever the court perceives that a sale of property has been made at a grossly inadequate price, such as would shock a correct mind, this inadequacy furnishes a strong, and in general a conclusive, presumption, though there be no direct proof of fraud, that an undue advantage has been taken of the ignorance, the weakness, or the distress and necessity of the vendor." See, also, the case of *Bunch* v. *Hurst*, 3 *DeSaus.*, 273, where a deed made by a very weak man, though capable of understanding the ordinary transactions of life, and though there was no direct evidence of fraud, was set aside.

The fact, therefore, that the plaintiff in this case has not been found to be absolutely *non compos mentis*, is not sufficient to deprive her of the relief which she demands. There can be no doubt but that, from her advanced age and from disease, she was extremely weak, both mentally and physically, and not in a condition to look after her own interests properly, and that the consideration for which she conveyed away her entire property to a mere stranger, not allied to her by any ties, either of blood or affection, was grossly inadequate, considering her extreme old age and infirmity, and that, under all the circumstances, the transaction was not such an one as can receive the sanction of a court of equity.

We think, however, that the Circuit Judge erred in directing the referee to inquire and report what damages the plaintiff had sustained, for the question of damages was one of the issues

raised by the pleadings, and when, by the original order of refer-
ence, the referee was required to hear and determine all the
issues of law and fact, and the plaintiff failed to offer any testi-
mony as to damages, it is too late now to reopen that question.
The judgment below must therefore be modified in so far as it
requires the referee to inquire and report as to the damages sus-
tained by the plaintiff.

The judgment of this court is that the judgment of the Circuit
Court, except as modified herein, be affirmed.

MR. JUSTICE MCGOWAN concurred.

MR. CHIEF JUSTICE SIMPSON, *dissenting.* It is admitted
that the property embraced in the papers which the plaintiff seeks
to annul by the action below belonged to the plaintiff. Nor is it
denied that she had the legal right to execute said papers and
thereby to convey said property to the defendant, if such was
her will and desire. Nor is it denied or doubted that said papers
were executed by her, and with all the formality necessary to
make them valid, as to their mere execution. Such being the
fact, all the presumptions are in their favor; and being thus
*prima facie* valid, they must stand until it is shown by satisfac-
tory testimony either that the plaintiff was incompetent at the
time of their execution, or that she was induced thereto by the
fraud, artifice, or undue influence of the defendant. Has such a
showing, one or both, been made, is the question in the case.

I have thoroughly and closely examined the testimony as
reported, biased somewhat, it may be, in favor of the plaintiff, and
yet I must say that, after analyzing and sifting said testimony
fully, and excluding therefrom all hearsay and gossip, in which it
abounds, it seems to me to be utterly destitute of the necessary
facts to impeach the instruments in question upon either of the
grounds mentioned. There is certainly no direct or positive evi-
dence reported on the question of the plaintiff's competency.
No expert was examined, nor were there any facts testified to by
other witnesses showing either general incapacity in the plaintiff
or that she did not understand this particular transaction or the
nature and character of the instruments which she executed. It
is true she was quite old and feeble, and was not expected to live

more than twenty-four hours, when the deed was executed. It is also true that she had to be lifted from bed and her hand had to be held and guided in affixing her signature thereto, but the evidence is silent as to the extent to which her mind and understanding had been impaired by her physical weakness and disease, and it will not do to say that old age and physical weakness merely are sufficient to disqualify one from disposing of his property.

Besides this, it is in evidence that, some two weeks after the execution of the deed, she recognized its existence and made a second paper, the bill of sale of her personal property, in harmony with and in furtherance of the scheme upon which the deed had been previously executed, to wit, the comfortable support and maintenance of herself and husband during their lives, to secure which she took a bond and mortgage from the defendant covering the property conveyed to him. The papers were drawn by Mr. Child, an attorney of standing, by the direction of the plaintiff; Mr. Child testifying to these facts, and saying "that from what he heard and saw, the plaintiff was as competent to transact her own business then as she is now." In the face of this testimony, I cannot see how it can be claimed that the plaintiff did not understand what she was doing.

It appears to me, too, that the testimony is destitute of facts impeaching the conduct of the defendant as to any improper agency in procuring these papers. He had no special control of the plaintiff. Nor does it appear that he exercised, or attempted to exert, any influence over her, either by threats, importunity, fraud, or imposition of any kind. It is true that Mr. Richey, who drew the deed, was carried to the house of plaintiff by the defendant. Why should he not have done so? If the plaintiff had made up her mind to execute the deed in favor of defendant, and he was informed of that fact, it was more in accordance with the idea of fair dealing that he should have a suitable person to prepare the papers, openly and personally, than to stand in the background, working entirely through others. True, too, that he had the deed properly recorded. What is there in this to excite suspicion? The paper was of a character which in law should have been recorded. Such being the fact, its record was

in accordance with law, and just what most business men would have had done. The law requiring this deed to be recorded, if the defendant had withheld its record, that fact would have needed explanation, rather more than the fact of recording, and would have been much more damaging to the conduct and character of the defendant.

It is said that the bond and mortgage was not recorded. This, however, was explained by Mr. Child, and the defendant was in no way responsible for the non-record of these papers. Nor did this occur from any want of understanding in the plaintiff as to her rights thereunder. If any one is to blame for this, it was Mr. Child himself; certainly not the defendant. Upon the whole, I have not been able to find any direct testimony in the case either impeaching plaintiff's mental capacity or showing that she was overreached by the circumvention, artifice, or undue influence of the defendant, or of any one in his behalf.

It is said, however, that while there is no direct evidence showing absolute incapacity in the plaintiff, nor imposition, perhaps, on the part of the defendant, yet when the age of the plaintiff is considered, and also her extreme feebleness, in connection with the remarkable character of the papers, transferring, as they did, her entire estate, real and personal, to the defendant, the inference, both of incapacity and imposition, is irresistible, and it is upon that ground that the papers should be declared void. The legal principle under which this is claimed is no doubt correct, and it is true that great mental weakness, yet short of absolute incapacity, may sometimes be a sufficient ground to invalidate instruments in which unconscientious bargains have been obtained, or where the inadequacy of consideration is so gross as to be explained in no other way, except from the imbecility of the grantor or the imposition of the grantee. But such cases are rare, and before this principle can be applied, the facts should be undoubted and overwhelming.

Now, can such an inference be drawn fairly from the facts of this case? What are those facts? The plaintiff at the date of the deed was an aged lady—nearly 83. She was sick, and thought to be near her end. Her husband was perhaps older than herself; he was certainly beyond "three score and ten."

They had no children. The plaintiff owned a small tract of land, I suppose about 125 acres, worth, it is said, upon valuation $20 per acre, or in the whole, $2,500, and some personalty, value not mentioned. These two aged people were living to themselves, the plaintiff's only relations being a brother and perhaps some nieces, with whom it seems she had no association. They were alone in the world, in possession of the property mentioned and with no other means of support, so far as it appears. Now, it is manifest that this aged couple, sick and feeble as they were, could not have been able to make even a scanty support by their own labor on the land which the plaintiff owned. Nor could they have done so by hired labor under their supervision and direction. An attempt to do so, in either of these ways, would no doubt have soon resulted in crushing debt, and finally in starvation or the poor house. The relations of the plaintiff were not present, giving aid and comfort. They themselves were absolutely powerless to provide for their necessities in their declining years. What need had they for this little tract of land and their household personalty, but through it to obtain an easy and comfortable living during the years before them? They could not take it with them beyond the grave. They could only use it while they lived, and the relations of the plaintiff had no claim upon them, or at least no such claim as demanded that they should not make all necessary use of it while they were alive for their comfort and support, even if this use required its entire destruction, leaving nothing to go to said relations.

Under these circumstances, the arrangement which the old lady made with the defendant, if fairly carried out by him, does not strike me as so remarkable and strange—certainly not so strange as to indicate irresistibly incapacity on her part, or imposition on the part of the defendant. She bargained for a comfortable and easy support both for herself and her husband during their respective lives, and she secured the enforcement of this obligation on the defendant by a mortgage of the land. True, she had refused to sell to the defendant a short time before this a small portion of this land at $50 per acre. In this she acted wisely, as she no doubt knew that the money received would soon go, while the land was permanent. The arrangement which this

old lady made, when all the circumstances are duly considered, though somewhat unusual, certainly cannot be said to be devoid of sense or reason, and if it was faithfully carried out by the defendant, fully and honestly, in all probability would be the best for the plaintiff and her husband. The bond and mortgage afford the means to her of having such faithful enforcement to the full extent of the property.

That it should have been made with a stranger is not of itself sufficient to avoid it. In this country the owners of property have the right to make their own disposition thereof, and while it is more in accordance with nature that relations should be preferred to strangers, yet the courts have no right to control parties in this respect. There are often reasons, facts and motives beyond the reach of the court, sufficient to influence the party, or if even within its reach, yet beyond its legal power to set aside or suspend. If the arrangement which the plaintiff made had been made with her brother, under all the circumstances surrounding her, could its wisdom be fairly impeached? Does the fact that it was made with a stranger to her in blood make it less wise—especially when she secured its enforcement so completely?

For the reasons given above I am unable to concur in the opinion of the majority.

Judgment modified.